**MONOGRAM MFG. CO. et al. v. F & H MFG. CO.**

**No. 10500.**

Circuit Court of Appeals, Ninth Circuit.

Aug. 9, 1944.

Rehearing Denied September 20, 1944.

Collins Mason, of Los Angeles, Cal., for appellant.

Lyon & Lyon, Frederick S. Lyon and Frederick W. Lyon, all of Los Angeles, Cal., for appellee.

Before DENMAN, STEPHENS, and HEALY, Circuit Judges.

DENMAN, Circuit Judge.

This is an appeal from a judgment holding invalid two United States Patents No. 2,266,929, hereinafter called the First Patent, and No. 2,271,879, hereinafter called the Second Patent, for temporary rivets, issued to Frank C. Wallace, in an action brought under the Declaratory Relief Act (Judicial Code § 274d; 28 U.S.C.A. § 400), and 28 U.S.C.A. § 41(7), by appellee F & H Manufacturing Co., a partnership, hereinafter called the plaintiff, against Monogram Manufacturing Company hereinafter called the defendant.

Plaintiff, showing an actual controversy, alleged that defendant, assignee of the patents, had represented to the trade and especially to plaintiff's customers that plaintiff was manufacturing and selling infringing devices. Plaintiff sought an injunction against the making of such representations and a decree that the Wallace patents were neither valid nor infringed. Defendant alleged the validity of its patents and in a counterclaim sought an injunction against their further infringement by plaintiff.

The district court gave judgment for the plaintiff. It found the Wallace patents invalid for lack of invention and anticipation,* and it enjoined the defendant from making further representations to the trade that the Wallace patents were being infringed by defendant. Defendant's counterclaim was dismissed. Defendant appeals from the judgment.

Both of the Wallace patents deal with what are called clamps, skin clamps and temporary rivets. The purpose of these clamps, which are principally used in the aircraft manufacturing industry, is to attach temporarily to each other two or more sheets of metal with superimposed perforations in them preparatory to permanent riveting through the perforations.

At one time nuts and bolts were used as temporary substitutes for the rivets. However, this often required a team of two men, one on either side of the metal sheets to be attached; and the method did not function well when, as often happened, the back of a sheet was difficult of access. Another disadvantage, perhaps most import-

---

* As to claims 1 to 5, inclusive, of Wallace Patent No. 2,266,929 and claims 1, 2, 3, 4, 5, and 8 of Wallace Patent No. 2,271,879.

ant of all in a time when rapid increase of aircraft production became of such vital importance, was the slowness of the bolting and unbolting process. The need for a more efficient and rapid method of securing a temporary clamping together of sheets of metal preparatory to riveting became generally apparent throughout the industry, especially after 1938. Many patents for clamps were sought and granted and some were put into use; among these are the Wallace patents in suit.

The first patent, a combination of unpatentable and patented elements, was applied for on August 23, 1941, and granted December 23, 1941. The second patent, claiming to be "a continuation in part" of the application for the first patent, was granted on February 3, 1942, following an application on November 4, 1941.

The claim of the second patent[1] relied on as typical in the plaintiff's brief here is "A clamp for temporarily holding together superposed perforated sheets, comprising: a hollow body having an end wall, a hole through the end wall, a spreader rotatably mounted in the body and having an elongated portion projecting outwardly therefrom through said hole, said end wall holding the spreader against outward longitudinal movement with respect to the body, a retaining pin slidably mounted in the body and having a split end portion projectable from the body astride the spreader whereby to be inserted through registering perforations in said sheets, said split end portion having diametrically opposed enlargements providing shoulders facing the end wall, one end against the pin whereby to slide the pin with respect to the spreader and thereby engage said shoulders against one of the sheets to resiliently clamp the sheets between said shoulders and the end wall of the body, the other end of the spring resiliently opposing longitudinal movement of the spreader inwardly of the body."

Less technically, it may be said that the device consists of a housing with a hole in its base. Through the base hole extends permanently a rod called the spreader which is to enter the plate holes. Also extending

are two parallel and flexible legs with the outer ends enlarged. These are on the sides of the permanent spreader and move outward or inward along it.

Normally these legs, which are the ends of a split rod, are drawn into and held in the housing by a strong spring. An operating tool, which is not a part of the invention, is used to compress the spring, and so push the legs out from the housing, and beyond the protruding spreader. So extended, the ends of the legs are capable of being wedged together by the sides of the superimposed sheet holes when pressed into them ahead of the spreader which enters the sheets behind them. On being pushed through the sheet holes, the leg ends spring apart and the enlargements extend beyond the circumference of the sheet holes behind them. On removal of pressure from the spring, its expansion pulls back the legs until their ends engage the back face of the sheet. The spreader in the sheet holes and between the legs holds the leg heads apart outside the diameter of the sheet holes, thus temporarily riveting them together. To remove the clamp the process is reversed. The spring is compressed forcing the leg ends away from the sheet holes and spreader so they are free to be pressed together in the sheet holes as the clamp with the spring still under compression is withdrawn.

It should be noted that in both patents the split rod retaining member and the spreader are rotatable with respect to the housing. The second patent differs from the first principally in that it makes explicit in its claims that the spreader is T-shaped and is pushed by the spring to the housing's end; also its claims to relative rotatability are less broad.

It will be seen that clamps such as are exemplified by the Wallace patents, capable as they are of easy and rapid operation by one person, are a great improvement over the crude nut and bolt method of fastening the sheets temporarily together. Similar clamp fasteners have completely or substantially replaced the more old-fashioned method before the Wallace pat-

---

[1] The brief's typical claim for the first patent is

"3.—A clamp for temporarily holding together perforated sheets in superposed relation, including a housing having a base adapted to rest against the outermost of the sheets, a hole through the base, a retaining member slidably mounted in the housing, and having legs slidable through and rotatable with respect to the hole whereby to be inserted through registering perforations in the sheets, and a spreader carried by and rotatable with respect to the housing, said spreader extending between the legs whereby to keep them apart."

414

ents, which were not the first in the field nor the first to meet with commercial success. For example, a device called the Cleco clamp, constructed under Blanc Patent 2,136,875, had earlier been almost universally used.

The controversy here concerns the claim that the Wallace combination added patentable novelty and utility to prior combinations in the rotatability of the housing around the legs when fixed in the sheets. In a prior patent, Hutchings 2,271,012, the legs spreader is a spring between them pressing them apart. In a succeeding patent, also prior, De Mooy 2,269,188, the spreader was a member acting rigidly against the inward pressure of the legs as the heads of the legs are pulled against the circumference of the hole in the back sheet by the spring.

It is admitted that the De Mooy patent contains all the combined elements of the Wallace patents, save that defendant claims that the latter have rotatability of the spreaders and legs within the housing and that in the De Mooy patent they have not.

De Mooy claim 6 is for

"A fastener for temporarily holding together at least two perforated sheets in superposed relation, including a housing having a base adapted to rest on the upper sheet, a vertical bore through said base, a retainer slidable in said housing, including two legs extending through such bore, an outwardly inclined later projection on each of said legs below such base, said projection being laterally movable toward each other for insertion through aligned perforations of said sheets and laterally movable away from each other for engagement with the under side of the lower sheet, and a rigid spreading member between legs active thereon during the slidable movement of said retainer in one direction for effecting lateral movement of said projections away from each other."

Plaintiff claims the word "rigid" in the phrase *"rigid* spreading member between such legs *active* thereon" means not rigid in the action of pressing against and resisting the inward pressure of the legs, but rigidly fixed to the housing. Hence, being so rigidly fixed, the housing is not rotatable around the legs. As will appear, it is unnecessary to resolve this question.

The district court found that in 1940 one Finkle had sold clamps embodying the claims of the Finkle patent, of a later date than the Wallace patents. Finkle testified

that in 1940 a clamp like Exhibit 4 in evidence, in which the housing was rotatable around the legs, was used by him to demonstrate to various plane manufacturers, Lockheed, Vega and Douglas, to procure orders. His testimony regarding the demonstrations in 1940 is not questioned and no witness from the nearby manufacturers was called to contradict him. Finkle also testified, under the examination of the attorney for the plaintiff, that he produced in that attorney's office a clamp like Exhibit 4 "in the tail end of November 1940." This testimony also was not questioned.

Finkle was asked also when he procured orders for the sale of such clamps. He was not certain whether the orders were procured before the earliest claimed date of invention of the Wallace clamps on February 5, 1941. It is sufficient to establish anticipation of rotatability of the housing about such a clamp's legs that in 1940 the rotatable Finkle clamp was in existence in plaintiff's attorney's office and was put to the business of demonstration for sale even though no orders at all were procured. Automatic Weighing Machine Co. v. Pneumatic Scale Corporation, Ltd., 1 Cir., 166 F. 288, 292; Deller's Walker on Patents, Vol. 1, pp. 377–381; Vol. 2, pp. 920, 930; Christie v. Seybold, 6 Cir., 55 F. 69, 76.

Likewise the district court held that the prior British patent to Rocroy 443,683 and the United States patent to Hutchings anticipated such rotatability of the housing. Though rotatability is not stated in the claims, the testimony is that the cheapest method of manufacturing the clamps of the Rocroy and Hutchings patents is to make the retaining legs and spreaders as separate units around which the housings are freely fitted. Rotatability is thus within the expected and likely mechanics of construction.

Underlying these contentions is the district court's finding that the factor of rotatability adds no patentable utility to the combination. The evidence on this is conflicting but the district court heard the witnesses and under rule 52 of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, we sustain this finding. We agree with the district court that all that is of utility in the combination of the first and second patents is anticipated and that they are invalid. The question of infringement is moot.

The judgment is affirmed.